# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs January 29, 2013

## STATE OF TENNESSEE v. MARVIN LEE KEELING

**Appeal from the Criminal Court of Sullivan County**
**No. S58417      Robert H. Montgomery, Jr., Judge**

**No. E2012-01158-CCA-R3-CD - Filed April 17, 2013**

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgments of the Criminal Court Affirmed**;
**Remanded**

Marvin Lee Keeling ("the Defendant") was convicted by a jury of one count of kidnapping, two counts of aggravated burglary, one count of assault causing bodily injury, and one count of assault by offensive touching. After a hearing, the trial court denied judicial diversion and sentenced the Defendant as a Range I offender to five years for the kidnapping conviction, five years for each of the aggravated burglary convictions, eleven months and twenty-nine days for the assault causing bodily injury conviction, and six months for the assault by offensive touching conviction, all to be served concurrently, for an effective sentence of five years. The trial court ordered the Defendant to serve one year of his sentence confined in the county jail with five years of probation. In this direct appeal, the Defendant contends that (1) the evidence is not sufficient to support his kidnapping conviction; (2) the trial court erred in denying judicial diversion; and (3) the trial court erred in denying full probation. Upon our thorough review of the record and relevant authorities, we affirm the trial court's judgments.

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

William A. Kennedy, Assistant Public Defender, Blountville, Tennessee, for the appellant, Marvin Lee Keeling.

Robert E. Cooper, Jr., Attorney General & Reporter; Lacy Wilber, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; William Harper and Teresa Nelson, Assistant District Attorneys, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

In August 2010, the Defendant was charged by presentment with one count of kidnapping, one count of intentionally presenting a false document with the intention that it be taken as a genuine governmental record, two counts of aggravated burglary, one count of misdemeanor assault causing bodily injury, and one count of misdemeanor assault by offensive touching. Also charged was Anthony Story, Jr., with whom the Defendant was tried before a jury in October 2011. At trial, the following proof was adduced:

Sergeant Jim McCready of the Sullivan County Sheriff's Department ("the SCSD") testified that, in the early morning of May 23, 2010, he came into contact with three individuals, one of whom was the Defendant, who identified themselves as bounty hunters. One of the three men asked for assistance in identifying a person they thought was Ben Blevins, for whom they had a bond revocation. Sgt. McCready accompanied the three men to a house located at 215 Hawk Street. Deputy Matney also went with them.

At the house, Sgt. McCready encountered a white male. Sgt. McCready asked for identification, and the man identified himself as Ryan Shealy. Shealy also provided identification documentation, including a driver's license, a Social Security card, and a birth certificate, all reflecting his identity as Ryan Shealy. Additionally, Sgt. McCready or Deputy Matney ran the individual's car tag, and it came back registered to Ryan Shealy. The inquiry reflected no outstanding warrants.

Sgt. McCready returned to the three bounty hunters, who had been waiting nearby. He advised them that there was not enough evidence to support an arrest on the basis that Shealy was, in fact, Blevins. Sgt. McCready told the three men to leave. Sgt. McCready and Deputy Matney then left the scene. Sgt. McCready testified that, as he remembered, the bounty hunters left before he and Deputy Matney did.

On cross-examination, Sgt. McCready acknowledged that only one of the forms of identification that Shealy provided was a photo identification.

Detective Sam Matney of the SCSD testified that, at the time in question, he was a patrol officer and working under the supervision of Sgt. McCready. He testified similarly to Sgt. McCready about meeting the three bounty hunters, going to the residence, and inquiring about the person's identification. He recalled Sgt. McCready informing the bounty hunters that the man in the house did not match the person they were seeking. Sgt. McCready told them to leave, and they did.

2

Chief Deputy Tony Allen of the Hawkins County Sheriff's Department ("the HCSD") was a "sergeant on patrol" at the time in question. He recalled a phone conversation with the Defendant between 8:00 p.m. and 9:00 p.m. on May 23, 2010, in which the Defendant asked, "if he took someone in custody and it was not the correct person, what would happen to him or would he be charged with kidnapping?" After requesting more detail, Deputy Allen told the Defendant that the situation was one in which "he needs to be careful" because he "possibly could be charged with kidnapping."

Later that night, Deputy Allen had another phone conversation with the Defendant. The Defendant told Deputy Allen that deputies from the SCSD had spoken with the man in question and identified him as someone other than the man the Defendant was seeking. The Defendant told Deputy Allen that he, the Defendant, thought the man in question had false documentation. Deputy Allen warned the Defendant again to "be very careful" and that "you could possibly be charged in this." Using his phone, the Defendant sent Deputy Allen a photograph of the man in the house. Deputy Allen compared the phone photo with a booking photograph on file of Ben Blevins. Based on the comparison, Deputy Allen could not make a positive identification of the man in the house, and he so informed the Defendant.

Deputy Allen also showed the two photographs to other deputies on duty. One deputy said that the person in the phone photo "could be" Blevins; one deputy said "[i]t was a maybe"; and a third deputy said, "No, it was not him." Deputy Allen relayed these various responses to the Defendant.

Later still, Deputy Allen had a third telephone conversation with the Defendant. The Defendant informed Deputy Allen that he was on "speaker phone" and said, "I would like for the gentleman that we have here to hear you say this." The Defendant then asked again if he would be charged with a criminal offense if he took the wrong person into custody. Deputy Allen testified that he told the Defendant "that he needed to be very careful, that charges could possibly be . . . placed against him for kidnapping if he took the wrong person." Deputy Allen clarified that he did not know who else was listening to the phone call on the Defendant's end. At the end of the conversation, the Defendant told Deputy Allen that "he was going to have the gentleman in custody and was bringing him in to" the sheriff's office.

Deputy Allen testified that, some time later, the Defendant, together with co-defendants Anthony Story and Clyde Collins, arrived at the sheriff's office with a fourth man. It was about 5:00 a.m. The fourth man was handcuffed. He identified himself as Ryan Shealy, and Deputy Allen confirmed Shealy's identity. Shealy was not booked into the jail but was released to a family member.

On cross-examination, Deputy Allen stated that Ben Blevins was in the Hawkins County "system" and that there were "charges for him" on identity theft and forgery. Deputy Allen confirmed that Blevins was a "fugitive from justice." He acknowledged that, during one of their phone conversations, the Defendant told him that he (the Defendant) had seen mail addressed to Blevins at the house where the man identified himself as Shealy. The Defendant also told Deputy Allen that he questioned the authenticity of the man's identification documents. Deputy Allen also acknowledged that, when he met Shealy, he told Shealy that he saw a resemblance between the photographs of Shealy and Blevins.

Deputy Allen recalled that Shealy brought several identification documents with him to the sheriff's office. Because Shealy was not booked, Deputy Allen did not obtain Shealy's fingerprints.

On redirect, Deputy Allen explained that, in addition to reviewing the identification documentation that Shealy brought with him, he spoke with other deputies who were familiar with Blevins. They told Deputy Allen that Shealy was not Blevins.

Deputy Christopher Funk of the HCSD testified that he was working with Deputy Allen on May 23, 2010. He knew Ben Blevins. He observed the man brought in by the Defendant, Story, and Collins. He testified that the man they brought in was not Ben Blevins.

On cross-examination, Deputy Funk explained that, when Deputy Allen showed him the phoned-in photograph, Deputy Funk told him that the man in the photograph was not Blevins.

Ryan Shealy testified that he had lived in the residence at 215 Hawk Street in Blountville, Tennessee, since July 2009. Right after he went to bed on the night of May 23, 2010, at about two or three a.m., he heard "a loud engine outside [his] bedroom." When he looked out the window, he saw a van driving off, and a Geo Metro car pulling into his driveway. He saw three men get out of the car. He turned on his front porch light, stepped outside, and asked the three men "what their business was on [his] property." He had never seen any of the men before.

The men identified themselves as "bonding company" and showed him some identification. Shealy learned their names and identified the Defendant at trial. The Defendant told Shealy that they were looking for Ben Blevins. Shealy did not know Blevins. Shealy provided the men with multiple forms of identification indicating that he was not Blevins, including his driver's license, social security card, voter registration card, utility bills, birth certificate, and the title to his car. In response to this documentation, the men "produced a search warrant." Shealy explained that the Defendant showed him the document

4

and told him that it was a search warrant. Although Shealy did not want the men in his home, he allowed them in on the basis of the "warrant." Shealy testified:

> Once they entered my home they went into every single room and every closet to – to search for this person and – and what might be related to him. And I watched as they went through drawers, cabinets, and they did not find anyone.

Shealy added that the three men went into different rooms, including his bedroom, his bathrooms, and "everywhere."

After the men were done searching, the Defendant took a photograph of Shealy's face with the Defendant's phone. The men then conversed among themselves. They left Shealy's home.

About fifteen to thirty minutes later, Shealy heard knocking at his door. He opened his door to find uniformed officers who identified themselves as being with the "Sullivan County Police [sic] Department." There was a cruiser parked in his driveway. Shealy learned that the two officers were Sgt. McCready and Deputy Matney. He provided them with the same identification documentation that he had shown the bondsmen. They asked if he had any tattoos and he told them he did not. Shealy also saw that the bondsmen were still nearby.

The deputies and bondsmen then left in their vehicles. Sometime later, Shealy looked out his window and saw one of the Defendant's co-defendants writing down Shealy's license plate number. Shealy had no further contact with the bondsmen that day.

The next night, about 1:00 or 2:00 a.m., Shealy heard a "very aggressive knock" on his front door and "men hollering, 'Bonding company.'" Shealy went to the door and the same three men were on his front porch. Shealy stated that they were "very intimidating" and that he felt "intimidated." The men wanted to search Shealy's home again. They also accused him of being Ben Blevins. Shealy verbally resisted the men, and the Defendant told him that he "was going to Hawkins County whether [he] liked it or not." The men told him that they had pepper spray, and the Defendant showed Shealy his pepper spray. Shealy told them that he was not going to fight them. Collins then put Shealy in handcuffs with his hands behind his back. Simultaneously, the Defendant "was calling someone" and "it seemed like he was asking if he could . . . take [Shealy] in." Shealy testified to his reaction: "I could not believe what – that this was happening to me. And I – I felt violated and I – I became emotional. I started crying a little bit. I was angry that I was being invaded." Shealy asked to call 911 and his father but "was denied." The men entered his house again and again went through his things.

5

The men took the folder in which Shealy kept his identification documents and Shealy's phone. They placed Shealy in the back seat of their car next to Story. Shealy was still handcuffed. The Defendant drove, and Collins was in the front passenger seat. The men told him that they were taking him to the "Hawkins County [Sheriff's] Department."[1]

At the sheriff's department, the men went inside and left Shealy in the car. A deputy opened the car door and asked Shealy to show his face, which Shealy did. The deputy shut the car door. After fifteen or twenty minutes, Shealy was taken inside the sheriff's department, and the handcuffs were removed. Shealy showed the deputies his identification. Shealy was released to his father.

Shealy added that he had never been arrested and had never been on bond.

On cross-examination, Shealy testified that he did not know Ben Blevins and had never heard the name prior to this incident. At the time the bondsmen accosted him, he was unaware of whether Blevins had lived in his house prior to Shealy purchasing it. He recalled that, after he moved into his house, some detectives had come by looking for someone who previously had lived in the house. He did not remember the name of the man they were seeking. Shealy stated that the document the Defendant gave him said "search warrant" on it and that it also contained an illegible signature.

Shealy also stated that, when the men returned to his house on the second night, Story asked him if he would voluntarily ride down to the police department to "straighten out" the situation. Shealy refused. At that point, Collins handcuffed him.

Shealy testified that none of the men tried to hurt him and that he was uninjured other than the pain caused to his wrists by the handcuffs. He did not seek medical attention. Shealy also acknowledged that Sgt. McCready had asked him to come down to Hawkins County, and he refused.

The Defendant testified that, in May 2010, he was employed as "a state bail enforcement agent for the State of Tennessee" and had been so employed for nine years. He stated that he was certified and that he had to participate in yearly continuing education. He added that, in his "nine years of being a recovery agent [he had] arrested over 4587 people." In May 2010, he was tasked with recovering Benjamin Scott Blevins, who was charged with multiple counts of identity theft. The materials that he was given included a photograph of Blevins, as well as his birth date, social security number, and a brief description. The

---

[1] We acknowledge that the record contains conflicting accounts about the actual date on which Shealy was taken to the sheriff's department.

6

materials also included Blevins' address at the time he was arrested, which was 215 Hawk Street.

On May 23, 2010, the Defendant went to 215 Hawk Street with Story and Collins, who had obtained their credentials to act as bail enforcement agents just days earlier. The Defendant acknowledged that he considered himself in charge. The men arrived at the house at about 12:45 or 1:00 a.m. Story and Collins went to the front door, and he "covered" the back door. The Defendant stated that he did not have any conversation with Shealy that night because he stayed at the back door. Eventually, all three men left and went to Kingsport.

The men returned to 215 Hawk Street the next day. The Defendant again went to the back door. Story and Collins gained entry to the house and let the Defendant in. At that time, the Defendant had his first contact with Shealy. The Defendant showed Shealy the photograph of Blevins. Shealy then agreed to show the Defendant some identification. Shealy showed the Defendant his driver's license. According to the Defendant, Shealy handed him "two pieces of mail that were already open with Benjamin Scott Blevins's name on it." The Defendant asked Shealy if he could take Shealy's photograph to send to the HCSD, and Shealy consented. The photographs of Blevins and Shealy were admitted and published to the jury.

The Defendant testified that, as soon as he saw Shealy, he thought Shealy was Blevins. He continued to believe that Shealy was Blevins even after Shealy showed him Shealy's driver's license. The Defendant called the SCSD and asked them to send a deputy. Deputies McCready and Matney responded, and all five men went to the house on Hawk Street. The Defendant, Story, and Collins waited while the deputies spoke with Shealy. After conferring with the deputies, the Defendant and his cohorts left.

The Defendant, Story, and Collins continued their investigation elsewhere, contacting Blevins' family members. The Defendant remained convinced that Shealy was Blevins. Accordingly, the three men returned to Shealy's house, the Defendant took Shealy into custody, and then they transported Shealy to the Hawkins County jail. The Defendant testified that he placed the handcuffs on Shealy. The Defendant testified that he continued to believe that Shealy was Blevins even after Shealy was released. The Defendant did not revise his opinion until fingerprints proved that Shealy and Blevins were not the same person.

On cross-examination, the Defendant stated that the fee for Blevins' recovery was $20,000, which would be split evenly between him, Story, and Collins. He admitted that they did not have a search warrant, and he denied telling Shealy that he had a search warrant. He also acknowledged that the appearance bond that he had for Blevins, which was dated November 9, 2007, indicated that Blevins' address was 150 Joe Hale Drive in Gray, Tennessee. He admitted that, after he had placed Shealy into custody, he did not look in

Shealy's folder of identifications. He insisted that the only identification that Shealy offered prior to being placed in handcuffs was his driver's license.

The Defendant presented no further witnesses.[2] The trial court charged the jury, including an instruction on the defense of mistake of fact. After deliberating, the jury convicted the Defendant of one count of kidnapping, two counts of aggravated burglary, one count of misdemeanor assault causing bodily injury, and one count of misdemeanor assault by offensive touching. The jury acquitted the Defendant of presenting a false document with the intent that it be taken as a genuine governmental record. After a hearing, the trial court denied the Defendant's request for judicial diversion and sentenced the Defendant as a Range I offender to five years for the kidnapping conviction, five years for each of the aggravated burglary convictions, eleven months and twenty-nine days for the assault causing bodily injury conviction, and six months for the assault by offensive touching conviction. The trial court ordered all of the sentences to be served concurrently, with one year of confinement in the county jail and five years of probation. The Defendant sought a new trial, which the trial court denied. In this direct appeal, the Defendant challenges the sufficiency of the evidence supporting his kidnapping conviction; avers that the trial court erred in denying judicial diversion; and contends that the trial court should have placed him on full probation.

## Analysis

### *Sufficiency of the Evidence*

The Defendant challenges the sufficiency of the evidence supporting his kidnapping conviction. He does not argue in his appellate brief to this Court that the evidence is not sufficient to support his other convictions. Accordingly, he has waived any challenge to the sufficiency of the evidence regarding his burglary and assault convictions. See Tenn. R. App. P. 13(b).

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does

---

[2] Co-defendant Story called no witnesses and did not testify.

not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

Kidnapping is defined as "false imprisonment . . . under circumstances exposing the other person to substantial risk of bodily injury." Tenn. Code Ann. § 39-13-303(a) (2010). False imprisonment, in turn, is defined as the knowing removal or confinement of another "unlawfully so as to interfere substantially with the other's liberty." Id. § 39-13-302(a) (2010). An unlawful removal or confinement is "one that is accomplished by force, threat or fraud." Id. § 39-13-301(13) (2010).

Taken in the light most favorable to the State, the facts adduced at the Defendant's trial established that he deliberately accosted Shealy at Shealy's home, dismissed Shealy's attempts to demonstrate that he was not the man the Defendant sought, ignored law enforcement officers' advice to leave Shealy alone, placed handcuffs on Shealy, placed Shealy in the backseat of the car the Defendant was driving, and transported Shealy to the HCSD. This conduct constituted an unlawful removal and confinement of Shealy. By handcuffing and transporting Shealy, the Defendant exposed Shealy, at a minimum, to the substantial risk of a traffic accident in which Shealy would be bodily injured. These facts make out a prima facie case of kidnapping. See State v. Daryl S. Hooper, No. M2007-00094-CCA-R3-CD, 2008 WL 2521592, at *10 (Tenn. Crim. App. June 24, 2008) (evidence sufficient to support kidnapping conviction where defendants went to victim's home with intention of transporting the victim to jail, placed the victim in handcuffs, placed the victim in a vehicle, and transported the victim to jail).

The Defendant argues that the evidence established that his actions regarding the victim resulted from a mistake of fact, a defense to the crime of kidnapping. See Tenn. Code Ann. § 39-11-502(a) (2010). Our criminal code provides that, with respect to kidnapping, "ignorance or mistake of fact is a defense to prosecution if the ignorance or mistake negates the culpable mental state of the charged offense." Id. As set forth above, the offense of kidnapping requires that the accused acted "knowingly." The culpable mental state of

9

"knowing" is defined as follows:

"Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Id. § 39-11-302(b) (2010). This Court previously has determined that kidnapping is a "nature of conduct" offense. See State v. Tracy F. Leonard, No. M2001-00368-CCA-R3-CD, 2002 WL 1987963, at *26 (Tenn. Crim. App. Aug. 28, 2002), perm. app. denied (Tenn. Dec. 16, 2002); see also Daryl S. Hooper, 2008 WL 2521592, at *13. Accordingly, "the State [is] required to show . . . that the defendant . . . removed or confined the victim and did so knowing that the removal or confinement was unlawful." Id.

When a defendant adduces sufficient proof to support the defense of mistake of fact, "the burden is on the state to prove beyond a reasonable doubt that the defendant did not act through ignorance or mistake of fact." T.P.I. – Crim. 40.01 (14th ed. 2010) (citing Tenn. Code Ann. § 39-11-201(a)(3)). The determination of whether the Defendant acted through ignorance or mistake of fact was a question of fact for the jury. Cf. State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994) (determination of whether defendant acted in self-defense so as to justify his conduct in shooting the victim was "essentially a question of fact for the jury"). Accordingly, a jury has the prerogative of rejecting a defendant's claim of mistake of fact. Cf. State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) ("It was within the prerogative of the jury to reject the claim of self-defense."). "Thus, in the context of judicial review of the jury verdict, in order to prevail, the defendant must show that the evidence relative to [his defense] raises, as a matter of law, a reasonable doubt as to his conduct being criminal." Clifton, 880 S.W.2d at 743.

The Defendant argues that, due to Shealy's physical resemblance to Blevins, Shealy's presence in a house that Blevins had previously resided in, and the accusations of identity fraud against Blevins, he did not know that his confinement and removal of Shealy was unlawful. Rather, he was convinced that he was acting lawfully, although mistakenly.

Clearly, the jury rejected the Defendant's testimony. Moreover, the proof is more than sufficient to support the jury's decision. The evidence established that Sgt. McCready warned the Defendant that the Defendant did not have a sufficient factual basis to support an arrest of Shealy. After reviewing a photograph of Shealy, Deputy Allen told the Defendant that he, Deputy Allen, could not make a positive identification of the subject as Blevins. Deputy Allen also showed the photograph to three other deputies and reported to the Defendant that none of the deputies stated positively that the subject was Blevins.

10

Indeed, one of the three deputies stated unequivocally that the subject was not Blevins, and Deputy Allen reported this response to the Defendant. Deputy Allen also warned the Defendant repeatedly about the danger of seizing the wrong person. Shealy himself tried repeatedly to demonstrate that he was not the person the Defendant sought, attempts the Defendant willfully ignored. Perhaps most incriminating, the Defendant repeatedly asked Deputy Allen if he could be charged if he took the wrong person into custody, indicating that the Defendant was aware and concerned that Shealy was not, in fact, Blevins. Nevertheless, the Defendant proceeded to handcuff and transport Shealy to the police station knowing full well that he might have the wrong person. This proof is more than sufficient to support the jury's rejection of the Defendant's claim of mistake of fact and to support the jury's conviction of kidnapping. The Defendant is entitled to no relief on this basis.

*Denial of Judicial Diversion*

After he was convicted, the Defendant filed with the trial court a Certification of Eligibility for Diversion in support of his request for judicial diversion. At the sentencing hearing, after hearing argument regarding the Defendant's request, the trial court denied judicial diversion. The Defendant contends that the trial court's ruling was erroneous.

Judicial diversion is a form of "legislative largess whereby a defendant adjudicated guilty may, upon successful completion of a diversion program, receive an expungement from all 'official records' any recordation relating to 'arrest, indictment or information, trial, finding of guilty, and dismissal and discharge' pursuant to the diversion statute." State v. Schindler, 986 S.W.2d 209, 211 (Tenn. 1999) (quoting Tenn. Code Ann. § 40–35–313(b)). We review a trial court's decision to grant or deny judicial diversion under an abuse of discretion standard. State v. Robinson, 328 S.W.3d 513, 519 (Tenn. Crim. App. 2010) (citing State v. Cutshaw, 967 S.W.2d 332, 344 (Tenn. Crim. App.1997)).

Judicial diversion is available only to a "qualified defendant," one who:

(a) Is found guilty of or pleads guilty or nolo contendere to the offense for which deferral of further proceedings is sought;

(b) Is not seeking deferral of further proceedings for a sexual offense, a violation of § 71-6-117 or § 71-6-119, or a Class A or Class B felony; and

(c) Has not previously been convicted of a felony or a Class A misdemeanor.

Tenn. Code Ann. § 40-35-313(a)(1)(B)(i)(a)-(c) (2010). Nevertheless, a defendant, even if qualified, is not entitled to a presumption that he is a favorable candidate for judicial diversion. See State v. Anderson, 857 S.W.2d 571, 573 (Tenn. Crim. App. 1992). Moreover,

11

in determining whether to grant judicial diversion, the trial court must consider seven factors: (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; (6) the deterrence effect on the defendant and others; and (7) whether a grant of judicial diversion will serve the interests of justice, including the interests of both the defendant and the public. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996).

In this case, the trial court carefully and methodically analyzed each of the seven factors relevant to a determination of whether to grant or deny judicial diversion. The trial court found that the circumstances of the offenses were "pretty egregious," weighing against diversion; that the Defendant's previous criminal history, including convictions for speeding and contempt of court, resulted in "some negative weight" against diversion; that the Defendant's social history weighed in favor of diversion; that the Defendant's mental and physical health weighed in favor of diversion; that the Defendant was "probably not amenable . . . to correction," weighing against diversion; that the denial of diversion would serve to deter the Defendant and others; and that a grant of diversion would not serve the interests of either the public or the Defendant. Accordingly, the trial court denied the Defendant's request for judicial diversion. The Defendant argues that the trial court erred in determining that he was not amenable to correction and that, had the trial court properly analyzed that factor, it would have granted judicial diversion.

When considering the Defendant's amenability to correction, the trial court found as follows:

> I remember that . . . in his testimony, the Defendant's testimony, . . . I think he probably still in some respects, to this day, thinks that the person that he arrested that night was the person that they were – that they were looking for, no matter what the evidence might be. I mean, I – I think he – he probably, you know, would – would still do that. And even – even today I think in his own mind he doesn't really feel like that he – he did anything – anything wrong; that it was just a mistake. In fact that's what [defense counsel] argued in opening statement; that it was just a mistake.
>
> And the problem, you know, bondsmen have a – have special rights and privileges. I mean, when you make the decision that you're going to be a bondsman or act as a bonding recovery agent and get permission of the . . . state to be able to . . . do that and act, I mean, you actually have a lot more powers in some respects than law enforcement officers do. . . .
>
> And . . . as a result of that, basically bondsmen act in many respects outside the . . . constraints . . . of the law. I mean, you know, in order to go

12

into somebody's house and arrest somebody, I mean, an officer pretty much has to have probable cause to be able to do that. The standard is not necessarily the same for a bondsman.

But at the same time, a – a bondsman or an agent working on behalf of a bonding company that's been authorized by law to do that, I mean, they still have the right to – an obligation, rather, to preserve the rights of – of other individuals. And sometimes I think that bondsmen take it upon themselves to say that they're really above the law and they can just do whatever they want to do.

And I think in this case [the Defendant] was doing that. That I – I don't think he really cared, you know, what the law was, and he continued to basically ignore everyone that was in front of him, whether it be the officers down in Hawkins County that said, "Well, one of us says 'no' and one of us is not sure." Just ignored that fact.

Ignored the fact that the two Sullivan County officers that actually met with this person and reviewed the documents that the person had, the victim had, were just going to ignore that.

Was going to ignore the fact that this – this person was still there the next night when they showed up at one or 2:00 in the morning and – and burst back into the house.[3]

I mean, just continued to – to ignore all – all of the evidence that the person that they had in front of them was not the person that they were – they were looking for. They just ignored it because they saw the money. . . .

I think it calls into question your amenability to correction. That you're going to do what you want to do because you think what you want to do is more important than following the law and protecting the – the rights of – of other individuals. That – that the money was the overriding factor in this case. And just – you're willing to ignore what anybody else was telling you,

---

[3] In assessing the circumstances of the offense, the trial court stated that, in addition to other evidence indicating that the victim was not Blevins was the fact that he was still in his house the next night after the Defendant and his cohorts first accosted him the previous night. The trial court reasoned that, if the victim had in fact been Blevins, he probably would have left the jurisdiction following his first encounter with the men seeking to take him into custody. Nevertheless, the Defendant ignored this additional indication that the victim was not Blevins.

13

including the advice of two sworn officers who said, "This isn't the person." And, you know, they didn't have the right to – to arrest the person.

Yet you [the Defendant] said, "Well, I'm a bonding person. I can go ahead and do that." So, you know[.]

And the officers – I think one of them had 20-some-odd years experience as a – as a deputy. So, you know, I find that you're probably not amenable to – to correction for purposes of my decision with regard to – to judicial diversion.

The Defendant contends that the trial court failed to consider that, prior to sentencing, he had been on bond supervision for six months and had complied and been cooperative with his probation officer. The Defendant also argues that his "lack of criminal history shows that he is very amenable to correction."

We are not persuaded. The record supports the trial court's findings with respect to the Defendant's amenability to correction (or lack thereof), as well as with respect to the trial court's other findings. The trial court considered all of the relevant factors and placed its reasons for denying diversion on the record. We discern no abuse of discretion by the trial court in denying judicial diversion. Accordingly, the Defendant is entitled to no relief on this basis.

*Denial of Full Probation*

After denying judicial diversion, the trial court proceeded to sentence the Defendant. The trial court determined that the Defendant is a Range I offender. Kidnapping and aggravated burglary are Class C felonies. See Tenn. Code Ann. §§ 39-13-303(b), 39-14-403(b) (2010). The Range I sentencing range for Class C felonies is three to six years. Id. § 40-35-112(a)(3) (2010). Assault causing bodily injury is a Class A misdemeanor and assault by offensive touching is a Class B misdemeanor. Id. § 39-13-101(b)(1) (2010). After applying several enhancement factors, the trial court sentenced the Defendant to a mid-range sentence of five years on the kidnapping conviction; to a mid-range sentence of five years on each of the aggravated burglary convictions; to the maximum sentence of eleven months and twenty-nine days on the assault causing bodily injury conviction; and to six months on the assault by offensive touching conviction. The trial court ordered all of the sentences to be served concurrently. Upon its consideration of manner of service, the trial court ordered the Defendant to serve one year of his sentence in confinement in the county jail and five

14

years on probation. The Defendant now contends that the trial court erred in denying full probation.[4]

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). Thus, this Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008).

Our supreme court recently held that the Bise standard of review is also applicable to "questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). Thus, in reviewing a trial court's denial of full probation, the applicable standard of review is abuse of discretion with a presumption of reasonableness so long as the sentence "reflect[s] a decision based upon the purposes and principles of sentencing." Id. The party appealing the sentence has the burden of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401 (2010), Sent'g Comm'n Cmts.; see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn.1991).

In making its sentencing determination, a trial court must consider:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114;

---

[4] Although the Defendant also contends that the trial court erred in its application of some enhancement factors, the Defendant does not contend that his sentences are too long. Accordingly, the Defendant has waived any issue regarding the length of his sentences. See Tenn. R. App. P. 13(b).

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2010). The trial judge also should consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(5) (2010). Additionally, the principles of sentencing reflect that the sentence should be no greater than that deserved for the offense committed and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. § 40-35-103(2), (4).

When a court determines the manner of service of a sentence, a defendant who (1) does not possess a criminal history showing a clear disregard for society's laws and morals, (2) who has not failed past rehabilitation efforts, and (3) who "is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary[.]" Id. § 40-35-102(5)-(6)(A) (2010). However, the trial court is "not bound" by this latter advisory sentencing guideline and need only "consider" it. Id. § 40-35-102(6)(D).

A defendant bears the burden of establishing his or her suitability for full probation. See Carter, 254 S.W.3d at 347 (citing Tenn. Code Ann. § 40-35-303(b) (2006)); State v. Mounger, 7 S.W.3d 70, 78 (Tenn. Crim. App. 1999). "This burden includes demonstrating that probation will subserve the ends of justice and the best interest of both the public and the defendant." Carter, 254 S.W.3d at 347 (internal quotation marks omitted). In determining whether to deny full probation and impose a sentence involving confinement, the trial court should consider the following:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1) (2010); see also Carter, 254 S.W.3d at 347.

16

In denying full probation and ordering the Defendant to serve a sentence of split confinement, the trial court found that the circumstances of the offense were "pretty egregious"; that the Defendant's actions were intentional and based on his decision that, because he was a bonding agent, he "could just do whatever [he] wanted to with impunity"; that the Defendant's actions were committed over the course of two nights; that the Defendant terrorized the victim; that the Defendant ignored the advice of law enforcement officers; and that the Defendant had failed to demonstrate that full probation was appropriate. The Defendant now argues that the trial court "failed to give due weight and proper consideration to the sentencing principles" and that the trial court erred in denying full probation.

We disagree. We discern no error by the trial court in ordering the Defendant to serve one year in confinement and five years on probation. In denying full probation and ordering a period of confinement, the trial court took into account the appropriate sentencing considerations. The proof in the record before us clearly does not rebut the presumption of reasonableness afforded the trial court's decision. Therefore, we conclude that the trial court did not abuse its discretion. Accordingly, the Defendant is not entitled to relief on this basis.

## Conclusion

For the foregoing reasons, we affirm the trial court's judgments of conviction. However, we remand this matter for the correction of the clerical error contained in the judgment order entered on the Defendant's conviction for assault by offensive touching such that the judgment order reflects a sentence of six months.


_____
JEFFREY S. BIVINS, JUDGE

17